## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

EXPRESSJET AIRLINES, INC.,                 §
                                           §
          *Plaintiff*,                     §
                                           §
v.                                         §          CIVIL ACTION H-09-992
                                           §
RBC CAPITAL MARKETS CORPORATION            §
*f/k/a* RBC DAIN RAUSCHER, INC., *et al.*, §
                                           §
          *Defendants*.                    §

## ORDER

Pending before the court is defendants RBC Capital Markets Corporation ("RBCCM"), Royal Bank of Canada ("RBC"), and John Piemonte's ("Piemonte") (collectively, "defendants") motion to transfer venue to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1404(a). Dkt. 19. After considering the motion, the plaintiff's response, the record, and the applicable law, the court GRANTS defendants' motion to transfer.

## I. BACKGROUND

This action arises from the sale of a large volume of auction rate securities ("ARS") to plaintiff ExpressJet Airlines, Inc. ("ExpressJet") by defendants in the weeks immediately preceding the failure of the ARS market. ARS are long-term debt investments that are traded at periodic, usually monthly, Dutch auctions. The securities are frequently marketed as an alternative short-term investment. Dkt. 17.

In January 2008, RBCCM, through broker Piemonte, contacted ExpressJet's cash manager, Eva Holtwick ("Holtwick"), to solicit purchases of ARS from RBCCM. Holtwick informed Piemonte that she was not familiar with such securities and asked Piemonte to provide her and

ExpressJet's Director of Corporate Finance, Brian Feldott ("Feldott"), with an overview of: how the securities were traded, the holder's ability to sell the securities before maturity, and any other risks associated with the securities.  ExpressJet informed Piemonte that it was looking for a "safe and liquid alternative" to commercial paper, and that any prospective investment must comply with the short-term investment liquidity requirements outlined in ExpressJet's corporate investment policy. Piemonte purportedly assured Holtwick and Feldott that the ARS sold by RBCCM were like cash, and served as a safe, liquid, short-term investment.  When specifically questioned about the risk of auction failure, Piemonte allegedly told Holtwick and Feldott that the market had never failed and that there was no risk of exposure.  ExpressJet contends that Piemonte promised that ExpressJet would not encounter any issues if it attempted to liquidate its securities at the end of each quarter, a requirement of ExpressJet's corporate investment policy.  And, as a fail-safe, should ExpressJet encounter any delay in selling the securities prior to the end of the quarter, RBCCM would buy back the ARS at par value, plus any accrued interest.  Piemonte also provided marketing materials created by RBC and/or RBCCM relating to ARS, which specifically touted the liquidity of ARS.  *Id.*

Based on Piemonte's representations, and those contained in the marketing materials, ExpressJet purchased approximately $62.8 million worth of ARS from RBCCM between January 11, 2008, and February 7, 2008.  At the time of these purchases, ExpressJet maintains that the market was artificially supported by defendants and other underwriters and broker–dealers who acted as principals for their own accounts, trading on information not known to the general public or the market in order to prevent auction failures.  When defendants and other key players stopped supporting the market in mid-February 2008, it collapsed, leaving ARS investors, including ExpressJet, with wholly illiquid, long-term debt instruments.  At the time of the collapse, ExpressJet held approximately $28 million of ARS.  Contrary to the alleged representations of Piemonte, and

despite repeated requests from ExpressJet, RBCCM refused to buy back the ARS from ExpressJet. *Id.*

ExpressJet contends that, at the time it purchased the ARS, defendants failed to disclose that defendants and other underwriters and broker–dealers manipulated the ARS market to prevent auction failures.   Further, ExpressJet alleges that Piemonte had knowledge of RBCCM's involvement in the manipulation of the ARS market and RBCCM's financial position in the market when he made the aforementioned representations and aggressively marketed these securities to ExpressJet.  *Id.*

After the collapse of the ARS market, the Securities Exchange Commission ("SEC"), along with various state Attorneys General and other regulatory agencies, began investigating the practices of RBCCM and other ARS underwriters and broker–dealers.  Ultimately, RBCCM entered into a settlement agreement with the SEC and the Attorney General of New York, in which RBCCM agreed to buy back its ARS from all entities with $10 million or less on deposit.  Additionally, RBCCM was required to use "its best efforts to provide liquidity by the end of 2009" to its ARS investors who did not qualify for the settlement buy-back.  *Id.*

Having obtained no recourse or remedy via the settlement agreement, ExpressJet filed suit against defendants in the 280th Judicial District of Harris County, Texas, alleging: violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Securities Exchange Act") and Rule 10b-5, promulgated thereunder; common law fraud; statutory fraud, pursuant to Texas Business & Commerce Code § 27.01; breach of contract; breach of fiduciary duty; negligent misrepresentation; negligence; professional negligence; negligent hiring, training, and supervision;

unjust enrichment; and disgorgement.  *Id.*; *see also* Dkt. 1.  Defendants removed the case[1] and

subsequently moved for transfer of venue to the Southern District of New York, in accordance with

28 U.S.C. § 1404(a).  Dkts. 1, 19.


## II. ANALYSIS

Section 1404(a) of Title 28 of the United States Code, the venue transfer statute, provides

that "for the convenience of the parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division where it might have been brought."  28

U.S.C. § 1404(a).  The court's inquiry into the propriety of transfer is two-prong.  First, the court

must determine if the transferee court, as specified by the movant, is one in which the case originally

could have been brought.  Second, the court must determine whether the convenience of the parties

and witnesses and the interest of justice require that the case be transferred.  *In re Horseshoe Entm't*,

337 F.3d 429, 433 (5th Cir. 2003).

This court performs each portion of the inquiry in turn.  In order to transfer the case *sub*

*judice* to the Southern District of New York, the court must first be satisfied that personal

jurisdiction can be properly exercised over each defendant and that venue is proper in the Southern

District of New York.  If the court concludes that the exercise of personal jurisdiction and venue are

proper, the court proceeds by analyzing various public and private factors to determine whether

transfer is convenient for the parties and witnesses and in the interest of justice.

---

[1] Although the notice of removal cites diversity as the basis for removal, the original and amended complaints reflect both diversity and federal question jurisdiction, amongst other bases.

**A. Is the Southern District of New York a District Where the Action Might Have Been Brought?**

*1. Jurisdiction & Venue*

*a. Standard for Jurisdiction*

A federal court sitting in diversity may exercise personal jurisdiction to the extent permitted by the laws of the state in which the federal court sits. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005) (citing *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997)). The Texas long-arm statute allows jurisdiction to be exercised to the extent allowable under the Due Process Clause of the Fourteenth Amendment. *Id.* at 424–25 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S. Ct. 1868 (1984)). The due process analysis entails a two-part inquiry. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S. Ct. 2174 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S. Ct. 559 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154 (1945). The first prong of the due process test requires sufficient minimum contacts with the forum, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339 (1940)). Minimum contacts are established through the assertion of either general or specific jurisdiction. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 865 (5th Cir. 2001). Specific jurisdiction exists when a suit "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros*, 466 U.S. at 414 n. 8. Even a single contact can support specific jurisdiction if the defendant "purposefully avails itself of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp.*, 471 U.S. at 475. "[I]f a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be

established for each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006).  In contrast, general jurisdiction refers to a suit which does not arise from a nonresident defendant's contacts with the forum, and is asserted only over a defendant who maintains "continuous and systematic" contacts in a particular forum.  *Id.* at 415.

However, when a federal court exercises personal jurisdiction over a defendant in a suit arising under a federal statute that specifically provides for nationwide service of process, the relevant inquiry is whether the defendant has minimum contacts with the United States, rather than the forum state.[2]  *Busch v. Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (citing *Sec. Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1315–16 (9th Cir.1985), *rev'd on other grounds sub nom.*, 503 U.S. 258, 112 S. Ct. 1311 (1992) and *Texas Trading & Milling Corp. v. Fed. Republic of Nig.*, 647 F.2d 300, 314–15 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S. Ct. 1012 (1982)).  Section 27 of the Securities Exchange Act provides that:

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.  Section 27 provides for nationwide service and also "extend[s] personal jurisdiction to the full reach permitted by the due process clause."  *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972).  "Thus, in analyzing whether personal jurisdiction is proper under [Section 27], we analyze whether the defendants had sufficient minimum contacts with the United States."  *Luallen v. Higgs*, 277 Fed. Appx. 402, 404 (5th Cir.

---

[2] Where the federal statute does not provide for nationwide service of process, the distinction between federal question and diversity jurisdiction is one without a difference.  In such cases, the federal court may only reach those parties over which it could exercise jurisdiction pursuant to the state long-arm statute.

2008); *see also Busch*, 11 F.3d at 1258; *Sec. Investor Protection Corp.*, 764 F.2d at 1315 (citing *Mariash v. Morrill*, 496 F.2d 1138 (2d Cir. 1974)).

If a defendant possesses the requisite minimum contacts with the forum state, or the United States, depending upon the claims and statutes at issue, the court then determines whether the exercise of personal jurisdiction would be unfair, unreasonable, or otherwise violate traditional notions of fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 476. In performing this inquiry, the court balances: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the states' common interest in fundamental social policies. *Asahi Metal Indus. Co. Ltd. v. Superior Court of Calif.*, 480 U.S. 102, 115, 107 S. Ct. 1026 (1987).

*b. Supplemental Jurisdiction*

Common law developed the doctrine of pendent jurisdiction to avoid piecemeal and parallel litigation when, like here, a plaintiff's complaint contained causes of action arising under both state and federal law. Traditionally, the doctrine permitted a federal court to entertain state claims, over which it would not otherwise have jurisdiction, when the claims were "derived from the same nucleus of operative facts." *Rodriguez v. Pacificare of Tex., Inc.*, 980 F.2d 1014, 1018 (5th Cir. 1993). This doctrine was codified under the umbrella of supplemental jurisdiction in 28 U.S.C. § 1367, which provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within  such original jurisdiction that they form part of the same case or controversy . . . .

28 U.S.C. § 1367(a).

*c. Standard for Venue*

Cited previously, Section 27 of the Securities Exchange Act provides that venue for civil suits arising under the Securities Exchange Act is proper in the district where "any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. "The 'act' contemplated by the statute need not be crucial, nor must 'the fraudulent scheme be hatched in the forum district.'" *Hilgeman v. Nat'l Ins. Co. of Am.*, 547 F.2d 298, 301 (5th Cir. 1977) (quoting *Hooper v. Mountain State Sec. Corp.*, 282 F.2d 195, 204 (5th Cir. 1960)). Nonetheless, the act must be material to the consummation of the alleged scheme. *Id.* However, "the defendant need not be physically present in the forum district nor need he commit more than a single act in the district if that act is important to the consummation of the scheme." *Id.* at 302 n.11; *see also Luallen*, 277 Fed. Appx. at 405 n.2.

*2. Application of the Law to the Facts*

In the instant case, ExpressJet claims that RBCCM and Piemonte violated Section 10(b) of the Securities Exchange Act and Rule 10b5 and that RBC violated Section 20(a) of the Securities Exchange Act. Dkt. 17. Thus, the jurisdiction and venue provisions of Section 27 are implicated as to each defendant. Accordingly, the court can consider the defendants' contacts with the United States as a whole in performing the jurisdictional inquiry.[3]

From the outset, the court observes that, to the extent that defendants have sufficient contacts with Texas, per a diversity-based analysis, which the parties have not disputed and defendants have

---

[3] The court's reliance on the jurisdictional and venue provisions contained in Section 27 is not intended to speak to the ability or inability of the parties to establish jurisdiction under the more limited diversity-based inquiry, which would focus exclusively on defendants' contacts with the transferee forum state, New York.

Notably, Piemonte, phoned New York on multiple occasions "in connection with the sale of ARS to ExpressJet," and RBCCM maintains an office in New York City, New York. Dkt. 29. As noted previously, even a single contact can give rise to specific jurisdiction. And, the existence of a New York office, which housed the ARS trading desk, is clearly sufficient for the exercise of jurisdiction over RBCCM.

waived by not raising previously, defendants have sufficient contacts with the United States as a whole, thereby justifying the exercise of personal jurisdiction in the Southern District of New York based on the federal securities claims pending against each defendant.  Regardless, the court specifically notes that Piemonte is a U.S. citizen and RBCCM, a Minnesota corporation, has its principal executive office in New York City, New York; therefore, their contacts with the United States are sufficient to confer personal jurisdiction in the Southern District of New York for the federal claims arising under the Securities Exchange Act, pursuant to Section 27.  Dkt. 17.

Despite ExpressJet's protestations that RBC does not maintain an office in New York, RBC claims that its contacts with New York arise from the existence of an RBC branch office in New York City, New York.  *See* Dkts. 27, 29.  While questions of fact in "dueling affidavits" are usually resolved in favor of the nonmoving plaintiff, RBC is undoubtedly more knowledgeable of the locations of its offices.  *See Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir.1990) (holding that failure to construe factual conflicts contained in affidavits in favor of plaintiff that were submitted to resolve a dispute regarding propriety of personal jurisdiction constitutes reversible error). Nonetheless, the court need not consider this factual discrepancy, because it is undisputed that RBC maintains offices elsewhere in the United States.  Dkt. 27 (acknowledgment by ExpressJet that "[RBC] does have branches throughout the southeastern United States").  Therefore, RBC possesses sufficient contacts with the United States to subject it to personal jurisdiction the Southern District of New York for the federal securities claim pending against it, in accordance with Section 27.

Having found that minimum contacts exist for each defendant, the court proceeds with an inquiry into the second element of the jurisdictional analysis: whether the exercise of personal jurisdiction would be unfair, unreasonable, or otherwise violate traditional notions of fair play and substantial justice.  Although the court finds, as explained below, that the case should be transferred

to the Southern District of New York, neither party has raised concerns sufficient to meet the high burden required for a finding that proceeding in either venue, the Southern District of Texas or the Southern District of New York, does not "comport with fair play and substantial justice." *Burger King*, 471 U.S. at 476. Therefore, the court concludes that the Southern District of New York can properly exercise personal jurisdiction over each defendant.

Additionally, the Southern District of New York can exercise jurisdiction over all of ExpressJet's state-law claims, which include common law fraud; statutory fraud under Texas Business & Commerce Code § 27.01; breach of contract; breach of fiduciary duty; negligent misrepresentation; negligence; professional negligence; negligent hiring, training and supervision; unjust enrichment; and disgorgement. All of the claims center on the alleged ARS market manipulation, defendants' roles therein, defendants' failure to disclose these activities, and any false, affirmative representations made by defendants regarding the stability and liquidity of the ARS market. Because all of the claims arise from the same set of factual allegations, the court concludes that the claims arise from the same controversy under Section 1367. Thus, the Southern District of New York can exercise supplemental jurisdiction over the state-law claims in the instant case.

Finally, the court examines whether venue is proper in the Southern District of New York. The parties do not seriously contend that venue is improper in the Southern District of New York. Nonetheless, the court observes that Piemonte allegedly called RBCCM's New York office frequently in connection with the sale of ARS. Further, RBCCM maintained its ARS trading desk in New York City, New York, which is also where the ARS market operated. Hence, ARS sales were actually consummated in New York City, New York. The consummation of the sales of ARS is not only *material*, but essential to the ultimate objective of the alleged fraudulent scheme: enticing investors into purchasing ARS in order to maintain the artificial market, thereby profiting from the

10

alleged fraudulent representations regarding the liquidity of the ARS and the viability of the ARS market. Therefore, the court concludes that venue is proper in the Southern District of New York.

## B. Do the Transfer Factors Suggest that Transfer to the Southern District of New York Is Convenient and in the Interest of Justice?

Because the court has concluded that the case at bar could have been brought in the Southern District of New York, the court proceeds with the second step of the transfer inquiry: a balancing of the private and public interest factors.  "There can be no question but that the district courts have 'broad discretion in deciding  whether to order a transfer.'"  *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 311 (5th Cir. 2008) (quoting *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998), in turn quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987) (internal quotation omitted in original)).  Although there are some limitations on this discretion, which are imposed by Section 1404 and Supreme Court precedent, the Fifth Circuit will, "in no case," "replace a district court's exercise of discretion with [its] own; [it] review[s] only for clear abuses of discretion that produce patently erroneous results."  *Id.* at 312.


### 1. Private and Public Interest Factors

The Fifth Circuit has "adopted the private and public interest factors articulated in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S. Ct. 839 (1947), a *forum non conveniens* case, as appropriate for the determination of whether a § 1404(a) venue transfer is for the convenience of parties and witnesses and in the interest of justice."  *Id.* at 315.  In weighing the public and private interest factors, no single factor is determinative, and the weight given each factor is generally determined on a case-by-case basis.

The private interest factors include:

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Id.* (quoting *In re Volkswagen AG* (*Volkswagen I*), 371 F.3d 201, 203 (5th Cir. 2004)).  The public interest factors are:

> (1) the administrative difficulties flowing from the court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.

*Id.*

Although the *Gilbert* factors are generally sufficient in a transfer analysis, "they are not necessarily exhaustive or exclusive."  *Id.*  For example, with respect to the public interest factors, "[c]ourts also consider judicial economy, that is whether a transfer would avoid duplicative litigation and prevent waste of time and money."  *Nature Coast Collections, Inc. v. Consortium Serv. Mgmt. Group, Inc.*, No. C-06-273, 2006 WL 3741930, at *6 (S.D. Tex., Dec. 18, 2006) (citing *Zoltar Satellite Sys., Inc. v. LG Elecs. Mobile Commc'n Co.*, 402 F. Supp. 2d 731, 735 (E.D. Tex. 2005); *Jordan v. Dixie Pump and Supply, Inc.*, No. Civ. A. 05-4027 , 2006 WL 861022, at *1 (E.D. La. Mar. 29, 2006); and *Gregoire v. Delmar Sys., Inc.*, No. Civ. A. 05-2812, 2005 WL 3541051, at *1 (E.D. La. Dec. 5, 2005)); *see also Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S. Ct. 805 (1964).

Importantly, plaintiff's choice of forum is not an *independent* factor in the court's inquiry.  Rather, the plaintiff's choice of forum is treated as a "burden of proof question."  *In re Volkswagen of Am., Inc.*, 545 F.3d at 314 (quoting *Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963) and *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966)) (internal quotation omitted).  The en banc panel in *In re Volkswagen of America, Inc.*, drew a distinction

12

between transfer and dismissal for *forum non conveniens*: A defendant seeking transfer faces a less imposing burden than a defendant seeking a *forum non conveniens* dismissal.  "In order to obtain a new federal [venue], the statute requires only that the transfer be '[f]or the convenience of the parties, in the interest of justice.'"  *Id.* (quoting *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1247 (5th Cir. 1983), and Section 1404) (internal quotation omitted) (alterations in original).  The Fifth Circuit held that the defendant seeking transfer must show only "good cause."

> This "good cause" burden reflects the appropriate deference to which the plaintiff's choice of venue is entitled.  When viewed in the context of § 1404(a), to show good cause means that a moving party, in order to support its claim for a transfer, must satisfy the statutory requirements and clearly demonstrates that a transfer is "[f]or the convenience of parties and witnesses, in the interest of justice."  Thus, when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected. When the movant demonstrates that the transferee venue is clearly more convenient, however, it has shown good cause and the district court should therefore grant the transfer.

*Id.* (quoting Section 1404(a)) (alterations in original).

### 2. *Application of the Law to the Facts*

#### a. *Private Factors*

##### i. Ease of Access to Sources of Proof

Defendants claim that most of the records relevant to this case are housed in RBCCM's New York City office; however, defendants have not suggested that the records are so voluminous as to make transporting them to Houston impracticable or that a tremendous imbalance exists between the volume of documents located in New York City as opposed to other locations.  Documents are frequently copied for use in litigation and assuredly documents will have to be transported regardless of the forum in which the case proceeds.  Moreover, the Fifth Circuit has acknowledged that modern technological developments have made sources of proof more accessible regardless of their physical

location. *Id.* at 316. While these technological advancements do not render this element superfluous, absent a more specific showing by defendants explaining how a transfer will ease access to the evidence, this factor weighs neither in favor of nor against transfer. *Id.*

ii. Compulsory Process of Witnesses

Federal Rule of Civil Procedure 45(b)(2) outlines the subpoena power of a federal district court, limiting the subpoena range to: places within the district of the issuing court; outside that district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection; within the state of the issuing court if a statute or court rule allows and the subpoena is issued by a state court of general jurisdiction sitting in the place specified for the deposition, hearing, trial, production, or inspection; and where the court authorizes on motion and for good cause, if permitted by a federal statute. FED. R. CIV. P. 45 (b)(2). Similarly, trial subpoenas for nonparty witnesses residing more than 100 miles from the courthouse are subject to motions to quash. FED. R. CIV. P. 45(c)(3).

Here, neither the Southern District of Texas nor the Southern District of New York enjoys absolute subpoena power over all of the proposed witnesses. The parties have identified Holtwick, Feldott, Piemonte, and other RBCCM employees, Lourdes Massanet, EJ Jeoung, and Patricia Garland, as key witnesses. Holtwick and Feldott are located in Houston, Texas; Piemonte and Massanet in Chicago, Illinois; and Jeoung and Garland in Seattle, Washington. Dkt. 27. However, the availability of employee–witnesses is often given less weight, as their attendance can be compelled by their party–employer, if not by the procedural mechanisms available to the court. *See Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 731 (S.D. Tex. 2002). But, the court tempers this line of reasoning by observing that, merely because a prospective witness is *currently* employed by

a party, there is no assurance that the employee will remain in the employ of the party at the time of trial.

Defendants also intend to elicit testimony from unnamed ARS broker–dealers from Citigroup and Banc of America, who are purportedly located in New York City, New York, and Charlotte, North Carolina. *Id.* However, plaintiff contends that these individuals can be found in Dallas, Texas, and Atlanta, Georgia. Regardless of these individuals' locations, none is found within the transferor or transferee district, or the 100-mile subpoena range of either. Therefore, the factor is neutral.

### iii. Convenience & Cost of Attendance for Willing Witnesses

Issues of convenience and costs for willing witnesses are perhaps the important factors in the transfer analysis. "When the distance between an existing venue for trial of a matter and a proposed venue . . . is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re Volkswagen of Am., Inc.*, 545 F.3d at 317 (quoting *Volkswagen I*, 371 F.3d at 204–05) (internal quotation omitted). "[A]dditional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment." *Id.* (quoting *Volkswagen I*, 371 F.3d at 204–05) (internal quotation omitted). The availability, or unavailability, of direct flights can also impact the court's determination. But, the convenience analysis is not a "battle of numbers." Instead, the court's inquiry is a qualitative one, based on the anticipated legal and factual nature of each witness's testimony. The convenience of one material witness may outweigh that of several less significant witnesses. 15 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE

15

AND PROCEDURE § 3851.  Regardless, transfer should not be granted where the *sole* result is to shift the inconvenience from one party to another.

Here, the majority of willing witnesses identified are RBCCM employees, including: those involved in the creation of the marketing materials; those with knowledge of RBC entities' positions in the ARS market; those who work on the ARS desk; and various supervisors and corporate representatives.  Dkt. 19.  Defendants contend that the vast majority of these unnamed individuals can be found in New York.  *Id.*  Yet, as noted above, plaintiffs indicate that at least some of the individuals are located throughout the country, in New York City, New York; Chicago, Illinois; and Seattle, Washington.  Dkt. 27.  As with compulsory service, the convenience of employee–witnesses is often given less weight; however, the same observation regarding continued employment applies. *See Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 731 (S.D. Tex. 2002).  And, although the court gives these witnesses *less* weight, that does not equate to a total lack of consideration of these witnesses.  Further, in the instant case, the court notes that plaintiff is a transportation company, which can more easily transport its two Houston-based witnesses to the transferee venue should transfer be granted, as compared to a more significant number of defendants' witnesses that would require transportation to Texas.  *See Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 805 F. Supp. 1392, 1397 (S.D. Tex. 1992).  Ultimately, the time and distance concerns prove largely inconsequential because neither location is convenient to all of the anticipated witnesses. And, neither party has suggested that transportation between the various metropolitan areas where the expected witnesses can be found and either venue would be particularly difficult due to a lack of available means of transportation.  Regardless of the venue in which the case proceeds, willing witnesses will be required to travel.  This factor, therefore, is neutral.

iv. Other Practical Problems: The "Catch-All" Factor

Significantly, multiple cases, similar both legally and factually, as they also relate to fraud in connection with the collapse of the ARS market, are pending before courts in the Southern District of New York.[4]

One case is a class action proceeding brought by plaintiff Brigham against two of the three defendants in the case before this court, RBCCM and RBC, styled *Brigham v. Royal Bank of Canada*. Dkt. 27, Ex. 7; *see also* Complaint, *Brigham v. Royal Bank of Canada*, No. 08-CV-4431 (WHP) (S.D.N.Y., filed May 12, 2008). In *Brigham*, like the instant case, plaintiff claims that defendants violated Section 10(b) of the Securities Exchange Act. The *Brigham* class action also contains allegations that defendants misrepresented the true nature of ARS and that "defendants knew, but failed to disclose to investors, material facts about auction rate securities." Finally, the *Brigham* plaintiff contends that the failure of the ARS market was a "result of the withdrawal of support by all of the major broker–dealers." Although Piemonte is not named personally in the *Brigham* complaint, the *Brigham* plaintiffs do contend that "Piemonte failed to disclose that the auction rate securities he was selling were only liquid at the time of sale because RBCCM and other broker–dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability." Dkt. 27, Ex. 7.

Notably, the *Bringham* case was voluntarily dismissed, *see* Dkt. 34; however, other similar actions are pending in the Southern District of New York before the same district court judge to

---

[4] Although defendants suggest that the case should be transferred pursuant to the first-to-file doctrine, the court concludes that analysis of the Section 1404 public and private interest factors is a more sound basis for transfer. Nonetheless, the rationale underlying the first-to-file doctrine is encompassed within the court's balancing of the public and private factors, namely the practical problems and judicial inefficiency caused by parallel litigation proceeding in Texas and New York. *See W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985). Accordingly the court does not rely solely upon the first-to-file doctrine in ruling on defendants' motion to transfer.

whom the *Brigham* class action was assigned.  For example, the SEC filed suit in connection with a finalized ARS-related settlement between the SEC and RBCCM in an action styled *SEC v. RBC Capital Markets Corporation*.  Dkt. 34; *see also* Complaint, *SEC v. RBC Capital Markets Corp.*, No. 09-CV-5172 (S.D.N.Y., filed June 3, 2009).  When the SEC filed suit, it noted that the case was related to four other ARS cases currently pending before courts in the Southern District of New York.

Additionally, two antitrust actions are pending against Citigroup and a number of other financial institutions, including defendants.  One action was brought on behalf of a purported class of ARS investors.  Dkt. 27, Ex. 5; *see also* Complaint, *Mayfield v. Citigroup, Inc.*, No. 08-CV-7747 (BSJ) (S.D.N.Y., filed Sept. 4, 2008).  The other suit was brought on behalf of a purported class of ARS issuers, rather than investors.  Dkt. 27, Ex. 6; *see also* Complaint, *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, No. 08-CV-7746 (BSJ) (filed S.D.N.Y. Sept. 4, 2008).  The two complaints describe similar factual scenarios as the instant case.  Central to the antitrust complaints is the allegation that "[when] defendants and their broker–dealers stopped artificially supporting and manipulating the auction markets, those markets immediately failed, resulting in the auction rate securities becoming illiquid." Dkt. 27, Ex. 6.  This same scheme is echoed in ExpressJet's complaint in the case *sub judice*.

Yet another action substantially similar to the case at hand, *Monster Worldwide, Inc. v. RBC Capital Markets Corporation*, was filed more recently in the Southern District of New York.  *See* Dkt. 34; 43, Ex. B; *see also* Second Amended Complaint, *Monster Worldwide, Inc. v. RBC Capital Markets Corp.*, No. 09-CV-4542 (DAB) (S.D.N.Y, filed June 16, 2009).  Like ExpressJet, Monster Worldwide alleges violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5; negligent misrepresentation; common law fraud; and breach of contract.  *Id.*

In each of these actions, plaintiffs raise similar claims against defendants and other underwriters and broker–dealers.  Defendants' alleged role in manipulating and contributing to the ultimate collapse of the ARS market, the means through which investors were induced into purchasing ARS, and defendants' knowledge at that time will be at issue in each case.  Because these cases involve common questions of law and fact, a transfer of venue to the Southern District of New York will be  more convenient for the parties and witnesses and will likely promote the just and efficient resolution of the litigation.  Centralization is likely to assist in avoiding duplicative discovery and to conserve the resources of the parties, their counsel, and the judiciary.  Should the cases be tried in different districts, sitting in different circuits, the courts and juries deciding the legal and factual issues may arrive at inconsistent results.  These concerns were precisely what prompted the Judicial Panel on Multidistrict Litigation ("Panel") to enter an order consolidating three ARS actions against Citigroup in the Southern District of New York on June 10, 2009.  Although Citigroup is not a defendant in this case, and the transfer was pursuant to Section 1407, the Panel's reasoning nonetheless applies to this court's analysis of a motion to transfer, pursuant to Section 1404(a), and, in particular, whether economies of scale and efficiencies can be realized by transferring the instant case to the Southern District of New York.  The Panel recognized that the

> three actions involve common questions of fact, and . . . centralization under Section 1407 in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.  All actions arise from allegations that Citigroup entities and/or its employees made misrepresentations or omissions in the context of the sale of [ARS].  Centralization under Section 1407 will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.
> . . .
> All actions focus on defendants' conduct in the market for ARS, which experienced widespread auction failures in February 2009.  While the specific representations Citigroup made to each purchaser of ARS may vary from ARS to ARS, the actions arise under the common factual background surrounding Citigroup's alleged role in manipulating (and contributing to the ultimate collapse of) the ARS market.

19

Dkt. 43, Ex. A; *see also* Citigroup MDL Order, *In re Citigroup, Inc., Auction Rate Securities (ARS)*

*Marketing Litigation (No. II)* (JPML, filed June 10, 2009). The cases pending in the Southern

District of New York and the case before this court may be ripe for consolidation, like the ARS cases

involving Citigroup, but that will be a decision to be made in the Southern District of New York.

And, numerous courts have held that transfer for the purpose of consolidating concurrent, ongoing

actions is proper where the concurrent actions are based on precisely the same issues. *See Cont'l*

*Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26, 80 S. Ct. 1470 (1960)); *see also Nature Coast*

*Collections, Inc. v. Consortium Serv. Mgmt. Group, Inc.*, No. C-06-CV-273, 2006 WL 3741930, at

*7 (S.D. Tex. Dec.18, 2006). In summary, the risk of duplicative discovery and inconsistent pretrial

and trial rulings is significant. Therefore, this factor weighs heavily in favor of transfer.

**b. Public Factors**

    i. Administrative Difficulties

    In their motion to transfer, defendants do not highlight any administrative difficulties that

would confront the parties in either the Southern District of Texas or the Southern District of New

York. The time between filing and the disposition of a civil case in the Southern District of Texas

is 6.2 months, compared to 8.4 months in the Southern District of New York. Dkt. 19; *see also* FED.

COURT MGMT. STATISTICS, JUDICIAL CASELOAD PROFILE: DISTRICT COURTS (2008), *available at*

http://www.uscourts.gov/cgi-bin/cmsd2008.pl. This difference in disposition time is negligible and

does not weigh in favor of or against transfer.

    However, ExpressJet notes that the difference of approximately nine months in the median

times between filing and trial of civil cases in the Southern District of New York and the Southern

District of Texas favors the Southern District of Texas. Dkt. 27. While that may be true to some

extent, exclusive reliance on this median statistic is slightly myopic in light of the potential for

discovery and pretrial efficiencies should the cases be centralized in the Southern District of New York. Given the multiple ARS cases pending before courts in the Southern District of New York, the case will proceed in a venue that is familiar with the factual background and legal issues pertinent to this litigation. Therefore, this factor is neutral.

ii. Local Interest

Defendants in the instant case include: a Canadian bank; a subsidiary of the bank, incorporated in Minnesota with its principal place of business and an ARS trading desk in New York City, New York; and an ARS broker–dealer, employed by the subsidiary, who resides in Illinois. And, ExpressJet is a Delaware corporation with its principle executive offices in Houston, Texas. While the complaint indicates that defendants reached out to the Texas plaintiff and fraudulently induced it to purchase ARS, a broader perspective exposes an alleged scheme of national proportion, involving broker–dealers from across the country and violations of federal securities laws in the ARS market, which operates out of New York City, New York. In fact, the only connection to Houston, Texas, is the location of the alleged victim's executive offices, where the purportedly fraudulent statements were received.

This court does not dispute that a state has an interest in preventing fraud committed against its citizens and citizen corporations; however, here, national interests and those of New York, in particular, prevail. While the Southern District of Texas has a strong interest in adjudicating a case involving harm to a Texas-based entity, the Southern District of New York has an equally compelling interest in policing New York entities operating within its borders and engaging in interstate business activities. Because the conflict being litigated arose from transactions made via RBCCM's New York City trading desk, with investors half-way across the country, the court finds that New York has an equal or greater interest than Texas in this litigation. Moreover, New York

City, New York, is widely known as the nation's financial capital, if not that of the world.  Investors throughout the country trade in markets operating out of New York.  New York's interest in regulating these markets predominates because the financial industry is critical to its overall economic health and viability, as well as that of the nation.  Therefore, the local interest factor weighs in favor of transfer to the Southern District of New York.

### iii. Familiarity of the Forum with the Governing Law

ExpressJet asserts claims under both Texas state law and federal law in the instant case.  While the Southern District of Texas is undoubtedly more familiar with Texas law,[5] courts in the Southern District of New York will have no difficulty applying the Texas law at issue in the case *sub judice*.  The state law claims are predominantly based on common law, with the statutory fraud claim being the exception.  Notably, the elements for a fraud and breach of contract under New York law are strikingly similar to those under Texas law.  Further, federal district courts, particularly when sitting in diversity, often apply foreign law in resolving the controversies before them.  The Southern District of New York, itself, has recognized that familiarity with the governing law is "only one of many factors and is 'accorded little weight on a motion to transfer, especially when no complex issues of foreign law are at stake.'" *Zangiacomi v. Saunders*, 714 F. Supp. 658, 662 (S.D.N.Y. 1989) (quoting *Noreiga v. Lever Bros. Co., Inc.*, 671 F. Supp. 991, 996–97 (S.D.N.Y. 1987)).  "Unlike foreign law, applying the law of another jurisdiction within the United States poses no particular problem to any federal forum."  *Id.* (quoting *Ayers v. Arabian Am. Oil Co.*, 571 F. Supp. 707, 710 (S.D.N.Y. 1983)) (internal quotation omitted).  Therefore, this factor is also neutral.

---

[5] Presumably, the theory is one of proximity, which, in the instant case, may bolster the argument that the Southern District of New York would be more familiar with securities law due to its location in the nation's financial capital.  However, as with the Southern District of New York's ability to apply Texas law, the court is confident that the both districts are equally capable of interpreting and applying federal securities law.

iv. Avoidance of Unnecessary Problems of Conflict of Laws

In both tort and contract cases, Texas follows the "most significant relationship test," as set forth in Sections 6 and 145 of the Restatement (Second) of Conflict of Laws. Likewise, New York courts apply the law of the jurisdiction with the most significant interest in or relationship to the dispute. *See DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 802 (5th Cir. 2007); *White Plains Coat & Apron Co., Inc. V.v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006). Thus, no conflict of law issue should arise if the instant case is transferred to New York and, accordingly, this factor is neutral.

v. Judicial Economy

"To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different district courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *DataTreasury Corp. v. First Data Corp.*, 243 F. Supp. 2d 591, 594 (N.D. Tex. 2003); *see also Jarvis Christian College v. Exxon Corp.*, 845 F.2d 523, 529 (5th Cir. 1988) (upholding transfer to district where other cases were pending that "involve[d] issues either identical, or substantially related, to the issues pending before the [transferor d]istrict."); *Fisherman's Harvest, Inc. v. Weeks Marine, Inc.*, 401 F. Supp. 2d 745, 748 (S.D. Tex. 2005) ("[I]t would be in the interests of judicial economy and justice to transfer this case in its entirety . . . so that all of the issues may be brought before and resolved by one court.").

The impact of having multiple, similar cases pending before courts in the Southern District of New York has been discussed previously. Addressing the cases in piecemeal fashion, in district courts throughout the country is likely to result in duplicative discovery and pretrial motions, which may result inconsistent rulings. Allowing the cases to proceed in a more centralized fashion, within a single district, will promote the effectiveness and efficiency of the litigation and conserve resources

23

of the parties, witnesses, and courts.  Additionally, because of the volume of related cases filed and the fact all of the cases will, to some degree, involve factual determinations regarding the defendants' conduct and role in the ARS market collapse, the potential for conflicting findings is high. Ultimately, "the existence of related litigation in a transferee court is a factor that weighs strongly in favor of transfer."  *DataTreasury Corp.*, 243 F. Supp. 2d at 594 (citing *Jarvis Christian College*, 845 F.2d at 528–29 (5th Cir. 1988)).  Therefore, this factor favors of transfer.


## II. CONCLUSION

Transfers pursuant to Section 1404 turn on a series of practical considerations, including: judicial economy, whether the transfer will avoid duplicative litigation efforts, and the possibility of wasted time and resources.  While the majority of the private and public interest factors neither favor nor weigh against transfer, several critical factors strongly support transfer of the case to the Southern District of New York.  The court cannot conceive of an arrangement more expensive, time consuming, or exhaustive of judicial resources, than keeping this single ARS suit in Texas while all of the other similar suits against defendants are litigated in the Southern District of New York.  The concurrent litigation of these suits, over 1,600 miles apart, would defeat many of the public and private interests protected by Section 1404(a).  In conclusion, the court finds that the public and private factors weigh in favor of transferring this case to the Southern District of New York.  The

convenience of the parties and witnesses and the interests of justice require that this case be transferred.  Therefore, defendants' motion to transfer (Dkt. 19) is GRANTED.[6]  Further, it is ORDERED that the case be transferred to the Southern District of New York.

It is so ORDERED.

Signed at Houston, Texas on July 27, 2009.

Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY

---

[6] Accordingly, the court does not rule on defendants' pending motion to dismiss ExpressJet's amended complaint.  Dkt. 24.

25